## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____  )
                                 )
UNITED STATES OF AMERICA         )
                                 )
                                 )
        v.                       )         1:21-cr-000218 (APM)
                                 )
CHRISTY CLARK                    )
                                 )
_____  )


## MEMORANDUM IN AID OF SENTENCING

## ON BEHALF OF CHRISTY CLARK


Christy Clark came to Washington, D.C, the early morning of January 6, 2021, with her husband, a close family friend, Mr. Spigelmyer, and a female friend of her husband.  Her intention that day was to hear President Trump's speech and show her support for him.  She never intended to hurt anyone or cause anyone to be hurt.  And she did not hurt anyone rather she tried to help a police officer who was about to be attacked by a guy with a knife.[1]  She along with her husband and friends heard President Trump speak. Afterwards they returned to their vehicle. They then decided to take their Trump flags and walk around to show their support and hear others who were supposed to speak at the U.S. Capitol.  They followed

---

[1] In Mr. Clark's post arrest statement to police he mentioned seeing his wife notify a police officer that an individual in the crowd had a knife.  Ms. Clark explained to undersigned her belief that this individual intended to confront that officer with the knife.

others who marched towards the Capitol.  They found themselves outside of the Capitol on the East side's main entrance.  Ms. Clark eventually entered this entrance with the crowd in essence pushing in that direction.  She and the three others she was with, walked around the rotunda.  She had never been inside the Capitol before, and was awed by the beautify of the artwork inside the rotunda.  She took some photos of the artwork and beauty she saw as well as of the crowd, she helped protect an officer and then when she and her husband saw things started to get a bit rough inside exited quickly from the same door they came in from.[2]  They did not want to be a part of anything violent and recognized it was time to leave.

Ms. Clark did not go beyond the rotunda.  While outside and inside the Capitol she did not chant for acts of violence or destruction to occur.  Nor did she take any actions to encourage such activity.  Her actions that day place her among the least culpable.  In some ways she was more a spectator than anything else.  In retrospect, she wishes she had never come to Washington, D.C. that day.  She feels she let her family down, her adult children who she is supposed to set an example for, were surprised and disheartened to learn that their mother had been present.  She has had to regain their trust and support.  She also recognizes how badly things got at the U.S. Capitol that day, and she is embarrassed to have been a part of what occurred.

---

[2] Recordings from inside the Capitol show Ms. Clark enter, walk around, and exit.  She was inside about 10 minutes.  She is not seen chanting, or doing anything egg others on.

Immediately upon her arrest, she cooperated with law enforcement. She turned her cellular telephone over and fully explained her conduct to law enforcement on that day. During that interview, she admitted her wrongdoing.

She moves the Court sentence her to 12 months probation. She has been under supervision now for this case, on pre-trial release for 20 months. During this time she has abided by the Court ordered conditions of release. She is a very good candidate for probation as she has proven that she can follow the court's pretrial orders and because she intends to move on in her life from the type of involvement and actions which lead to her arrest in this case. She now has no interest in showing support for politicians except by way of her vote. She and her husband recently sold their home, and intend to live a simpler life. She also has no choice but to focus on the myriad of debilitating health issues that plague her.

Ms. Clark suffers from severe allergic reactions to many things including foods, minerals and chemicals. Test results show she has more than 30 environmental allergies. Her allergic reactions can at times cause her much pain, stomach problems, ocular migraines, that affect her vision, debilitating inflammation including throat swells which have required medically stretching her throat so she can breathe.[3] During the pendency of her case she has gone from specialist to specialist to gain an understanding of what ails her and to be fully diagnosed and obtain treatment. It has been trial and error at times to assess what is safe for her to breath, eat and drink from that which causes a reaction.

---

[3] While in D.C. on January 6, she was in pain, and had to sit down often.

Hence, a sentence of prison would greatly exacerbate an already delicate equilibrium she is currently trying to maintain.  In the jail setting, the foods served, the water, and the cleaning agents would in all likelihood be severely detrimental to her body and cause much physical suffering and probably multiple emergency hospitalizations.

Recently, she and her husband moved to live "in the woods" at Spigelmyer property.  Since living there, she has been able to drink fresh spring water without the chemicals and residues of other city water cleaning processes and has noticed her health ameliorate.  She hopes that the court will permit her once again to hunt so that she can eat minimally processed red meat.

Besides the severe allergy reactions, she suffers from hypersomnia, rheumatoid arthritis, myalgia, lymphocytic esophagitis, thoracic outlet syndrome, and asthma. (See Pre-sentence Report, ("PSR") #47).  The presentence report also notes the various medicines she is prescribed. (Id.).  She also recently started seeing neurologists due to  inflammation in the brain.  It has been determined that this has also been caused by allergic reactions.  She has been informed and she is considering applying to various medical facilities including the Mayo Clinique in Florida, John Hopkins in Baltimore, and a medical facility in Tennessee for their multi-chemical sensitivity studies and treatments.  If accepted, she would reside at the facility and be constantly monitored.  She would be there initially for a two month program, then one week off, followed by another two months on site. Another option her doctors suggest, are possible infusions.

In addition to her troubling health concerns, she presents with an extremely difficult past for which she has been receiving therapy.  One wonders if all her current health problems stem to some degree from the abuse she suffered in the past.  Surely her mental health issues do.  As the presentence report noted she receives treatment for Post-Traumatic Stress Disorder and Major Depressive Disorder.  She has been going to therapy for several years and has made great progress in developing coping skills.  She probably developed these mental health issues partly from being sold for sex by her own mother, while she was a mere child to support her mother's drug habits.  (see PSR # 40).  She was further traumatized by her ex-husband.[4]  One violent encounter with him occurred after he came home having smoking crack for one week while in the woods.  He tried to rape her and then he beat her so badly she had to go to the hospital.  He dragged her through their home so forcefully that the hospital staff thought she had been put on fire.  She lost conscious numerous times and he beat her up numerous times.  Although he was initially charged with a felony offense he ended up pleading to simple assault.  Another time, he beat and raped her on a child drop off day.  She was with him from the age of 15 to 25 "when he tried to kill me."  Soon afterwards, she was fortunate enough to meet the man she is currently married to, and she has gained a peaceful home life.  Nevertheless, the trauma from these incidents has affected her immensely.

---

[4] Due to undersigned's trial schedule the whole month of September, undersigned was unable to provide this information to the presentence report writer before the report was prepared.

Prior to Ms. Clark's arrest in this case, she was employed. Both she and her husband worked at the Waterside Campground near where she lived. She enjoyed this work immensely, it permitted her to be outdoors in a beautiful environment helping children to learn crafts, doing ground keeping including painting, pool cleaning, and giving boat tours to the campground guests. Unfortunately, she lost this job in the fall of 2021 due to her arrest in this case.

Much to her credit and irrespective of the disturbingly dysfunctional childhood and relationship Ms. Clark had with the father of her children, she raised three healthy children. The youngest is 19, the middle child is 23, and the eldest 25. One of her sons is an electrician, the other son works as a supervisor for a home building company, and her daughter takes care of mentally challenged children. They are all on their own, living independent lives.

A sentence of 12 months probation is supported by the 18 U.S.C. §3553(a) factors the Court must consider. Her actions on January 6, place her in the least culpable group of persons present at the U.S. Capitol on that day, hence such a sentence promotes respect for the law. It is clear her intent in coming to the Capitol was to merely be a spectator as she did not come wearing combat clothes or any other type of protective gear. Deterrence is not a factor that warrants concern. As described above, based upon her current lifestyle and plans, she has no intention of participating in further rallies, protests, or even to listen to politicians speak at

events.  Further, to sentence her to anything but probation would cause

unwarranted sentence disparity.[5]

     In conclusion, Ms. Clark, sincerely urges this Honorable Court sentence her

to probation.  A sentence greater than that is unwarranted nor is it necessary.  Ms.

Clark appreciates her error as well as her requirements to the court during her 20

months of pre-trial supervision.

               Respectfully submitted,

               OFFICES OF ELITA C. AMATO

                   /s/
_____
               Elita C. Amato, Esq.
               2111 Wilson Blvd.
               8th Floor
               Arlington, VA  22201
               Tele:  703-522-5900

**CERTIFICATE OF SERVICE**

I hereby certified that this Memorandum was filed using the ECF pacer system, thereby providing notice of service to government counsel, on this 14th day of October 2022.

        /s/
_____
        Elita C. Amato

---

[5] Counsel to co-defendant Spigelmyer, filed the most recent sentencing chart of January 6 cases, and highlighted certain sentences imposed for purposes of supporting a sentence of probation vis a vis unwarranted sentencing concerns.  Ms. Clark joins those arguments presented.