**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-218 (2) (APM)** |
| **v.** | : | |
| | : | |
| **CHRISTY CLARK,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Christy Clark to four months' home detention as part of a 36-month term of probation, 60 hours of community service, and $500 in restitution.

### I.      Introduction

Defendant Christy Clark, a 44-year-old maintenance worker, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars in losses.[1]

---

[1]      Although the Statement of Offense in this matter, filed on June 17, 2022, (ECF No. 73 at ¶6) reflects a sum of more than $1.4 million dollars for repairs, as of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Defendant Christy Clark pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of home detention is appropriate in this case because (1) the defendant remained in the Capitol, specifically the Rotunda, for nearly ten minutes when it was clear that police were attempting to clear that area, (2) the defendant made public posts on her Facebook page indicating enthusiasm for the riot as it was happening and posted photos that she took on Capitol grounds, which glorified the riot and her participation in it, (3) the defendant sent private messages demonstrating pride in having participated in the riot and lack of contrition, and (4) the defendant has yet to show any meaningful remorse for her participation in the riot.

The Court must also consider that Christy Clark's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. *See United States v. Thomas Fee*, 1:21-cr-00133 (JDB), Tr. 04/01/2022 at 17 ("The defendant was an active participant in a mob assault on our core democratic values and our cherished institution. And that assault was intended by many and by the mob at large in general to interfere with an important democratic process[ ] of this country. I cannot ignore that, cannot pull this misdemeanor out of that context.") (statement of Judge Bates). The defendant's actions and those of her fellow rioters enabled the breach of the Capitol, threatened the lives of the police officers, legislators and their staffs, and disrupted the certification vote for several hours. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, the facts of and

circumstances of Christy Clark's crime support a sentence of four months' home detention as part of a 36-month term of probation, 60 hours of community service, and $500 in restitution.

## II.      Factual and Procedural Background

### *The January 6, 2021, Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol.  (*See* ECF No. 66 (Statement of Offense), at 1-7.)  As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent—contributed, directly and indirectly, to the violence and destruction of that day.  With that backdrop we turn to Christy Clark's conduct and behavior on January 6.

### *Defendant Matthew Clark's Role in the January 6, 2021, Attack on the Capitol*

Christy Clark and her co-defendants, Matthew Clark (Christy Clark's husband) and Paul Spigelmyer (a friend), drove together from their homes in Lewistown, Pennsylvania, to attend the "Stop the Steal Rally" in Washington, D.C.  On January 6, 2021, they attended the rally and were admitted to the cordoned-off area at the Ellipse, near the White House.  After the former president finished speaking, the Clarks and Spigelmyer returned to their car to collect some items, including the flags pictured below, then headed towards the Capitol.



*Figure 1 – Screenshot of image posted to Christy Clark's Facebook page showing Matthew and Christy Clark and a friend walking towards the Capitol on January 6.  (Spigelmyer not pictured)*

The Clarks and Spigelmyer approached Capitol grounds from the west, crossed the grounds on the North Side, and approached the Capitol building on its East Front.  By the time of their arrival, the riot was well underway.  Hordes of rioters who, by the end of the two o'clock hour, had successively breached the East Rotunda Doors, attacking police and smashing glass in the Doors in the process, crowded the East Stairs.

While the defendants likely did not witness the initial breaches of these Doors, as they arrived on Capitol grounds closer to 3:00 p.m., they were aware that the Capitol had been breached. Matthew Clark posted the following to Facebook page at 2:22 p.m. on January 6:



*Figure 2 – Screenshot of January 6 post on Matthew Clark's Facebook page*

Christy Clark sent a private Facebook message at 2:24 p.m. stating, "Capital has been breached,"

and, at 2:26 p.m. "We r headed there [the Capitol] now preped [sic] for war."

On Capitol grounds, the Clarks took photos, which they posted publicly to Facebook.



*Figure 3 – Image posted to Matthew Clark's Facebook page showing crowd of rioters having overtaken the East Front of the Capitol*



*Figure 4 – Screenshot of post to Matthew Clark's Facebook page showing rioters packed into the area directly outside of the East Rotunda Doors and a comment from Matthew Clark that says, "My wife took this pic."*



*Figure 5 – Screenshot of image posted to Christy Clark's Facebook page showing rioters packed into the area directly outside of the East Rotunda Doors*

The Clarks and Spigelmeyer entered the Capitol through the East Rotunda Doors at approximately 3:05 p.m.  As the defendants crossed the threshold of the Capitol building, rioters inside rapidly shuffled backwards as if trying to get out of the way.  CCTV shows the defendants

entering the building with momentum, suggesting that they either ran in or were pushed from the outside.  All three carried large flags on poles as they entered.



*Figure 6 – Screenshot of CCTV showing the Clarks and Spigelmyer breaching the Capitol through the East Rotunda Doors at approximately 3:05 p.m.*

The defendants proceeded directly into the Rotunda which was already packed with rioters. Almost immediately after the defendants' arrival in the Rotunda, a large contingent of Metropolitan Police Department officers arrived and began to clear rioters from the area.



*Figure 7 – Screenshot of CCTV showing the Clarks and Spigelmyer in the Rotunda filled with rioters and police*

Rather than turn around and leave, the defendants stood and watched for multiple minutes while police closed in.   As they watched officers clearing the Rotunda, Christy Clark and Spigelmyer pulled hoods over their heads and covered their faces, as if trying to obscure their identities from the police or protect their mouths and noses from chemical irritant.



*Figure 8 – Screenshot of CCTV showing defendants in Rotunda, Matthew Clark pointing at police while they clear the Rotunda*

Before long, the successful efforts of police to clear the area penned the crowd, including the defendants, on one side of the Rotunda.  As the police closed in, the defendants saw rioters pushing back and getting aggressive with police (*see* Figure 9, below).  At that point, the defendants had no choice but to move with the crowd toward the nearest exit, the East Rotunda Doors.



*Figure 9 – Screenshot of CCTV showing defendants in a crush of rioters as police clear the Rotunda*

After being pushed out of the Rotunda, the defendants reentered the interior lobby of the East Rotunda Doors.  On their way out, Christy Clark turned towards police and gestured at them, then laughed, as if jeering at the officers.  The defendants exited the Capitol building at approximately 3:13 p.m.

 

*Figures 10 and 11 – Screenshots of CCTV showing Christy Clark gesturing at police standing by while the Rotunda clears*



*Figure 12 – Screenshot of CCTV showing defendants exiting the Capitol*

*Defendants' Social Media Activity*

Defendants Matthew and Christy Clark posted publicly visible photos from their time on Capitol grounds to their Facebook accounts, as shown above in Figures 1-5.  Christy Clark publicly posted one photo from inside the Capitol Rotunda:



*Figure 13 – Screenshot of publicly visible post to Christy Clark's Facebook page showing the Capitol Rotunda dome from the inside of the building*

To this photo (Figure 13), Christy Clark added a comment: "I stopped and took a second to pray before I took this pic. It was overwhelming to say the least."  Christy Clark privately messaged multiple people in the hours after the riot, saying "We were inside."  Christy Clark said in one private Facebook message, "Bitch I went right in there [the Capitol]."  In another private message to a Facebook friend, to whom Christy Clark sent photos and video, Christy Clark said, "I have pics I'm not posting right now till we see if I'm already in trouble. Lol."  Information obtained by the FBI suggests that Christy Clark deleted the publicly visible posts on her Facebook page shortly after posting them.

Spigelmyer took photos from inside the Capitol which he sent to Facebook "friends" in private messages:



*Figures 14 (left), 15 (middle), 16 (right) – Photos sent by Spigelmyer via private Facebook message, which appear to have been captured inside the Capitol Rotunda.*

With Figure 14, Spigelmyer included the message: "This is a picture of the moment we stormed the doors." One of the "friends" to whom Spigelmyer sent a private message asked, "Where [sic] you in the group that got into the Capitol" and Spigelmyer replied, "Yes we were the second round of people break in." The friend then asked, "You didn't get arrested did you," and Spigelmyer replied, "No but it was close."

Spigelmyer also made statements after and related to the Riot in posts to his Facebook page, including, "What happened at the capital yesterday should and must continue till this election fraud is stopped"; (2) "My view of the capital is, burn it to the ground"; (3) "I am all for more protest and storming the capital building and I would love to see them burn it to the ground"; (4) "The capital building needs to be burnt down it doesn't belong to the people that work there"; and (5) "When it comes to Nancy Pelosi trying to impeach Donald Trump I think the best thing that could happen is for the MS 13 gang members to go to her house and take care of business." (*See* Figures 17-19, below.)



*Figure 17 – Public post on Spigelmyer's Facebook page*



*Figure 18 – Public post on Spigelmyer's Facebook page*



*Figure 19 – Public post on Spigelmyer's Facebook page*

*Christy Clark's FBI Interview*

Christy Clark voluntarily agreed to be interviewed by the FBI after she was arrested.

Christy Clark reported activities and observations consistent with the government's evidence,

including the time of the defendants' arrival on Capitol grounds, what the defendants saw once

they arrived on Capitol grounds, and what happened while they were inside the Capitol. Christy

Clark claimed that she and her co-defendants only entered the Capitol building after being pushed

from the outside, a statement which is belied by her message to a friend that she entered the Capitol enthusiastically, or, as she put it: "Bitch I went right in there."  Christy Clark reported that she saw a rioter pull a knife during an altercation with a police officer.  While Christy Clark was generally forthcoming about her conduct on January 6—i.e., what she did and when—she minimized her conduct, stating that what she and her codefendants were doing at the United States Capitol was just like what they've done in Harrisburg at the Pennsylvania Capitol.  She suggested that the defendants thought they were going up to the "top" of the Capitol because that's where they would hear the "good speeches."  These statements are contradicted by messages that she sent before even reaching Capitol grounds that the Capitol had been breached and her enthusiastic entry.  She did not apologize for her conduct and did not appear to have any regrets about entering the Capitol on January 6.

*The Charges and Plea Agreement*

On February 8, 2021, the United States charged Christy Clark by criminal complaint with violations of 18 U.S.C. § 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G).  On March 12, 2021, the United States charged Christy Clark by four-count Information with violating 18 U.S.C. § 1752(a)(1) and (2) and 40 U.S.C. § 5104(e)(2)(D) and (G).  On May 31, 2022, pursuant to a plea agreement, Christy Clark pleaded guilty to Count 4 of the Information, charging her with a violation of 40 U.S.C. § 5104(e)(2)(G).  By plea agreement, Christy Clark agreed to pay $500 in restitution to the Architect of the Capitol.

## III.    Statutory Penalties

Christy Clark now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G).  As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000.  The defendant must also pay

restitution under the terms of her plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of four months' home detention as part of a 36-month term of probation, 60 hours of community service, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, was a crime unparalleled in American history and defies comparison to other violent riots.  It represented a grave threat to our democratic norms and practices.  Indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.

While each defendant must be sentenced based on their own conduct, this Court should take into account that each person who entered the Capitol on January 6 without authorization did so under extreme circumstances.  As they entered the Capitol, they very likely crossed through numerous barriers and barricades and heard the violent outcries of a mob. Depending on the timing

and location of their approach, they also may have observed extensive fighting between the rioters and police and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while assessing Christy Clark's individual conduct and fashioning a just sentence, this Court should look to a number of critical aggravating and mitigating factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) defendant's reaction to acts of violence or destruction; (5) whether, during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from police officers; and (9) whether the defendant demonstrated sincere remorse or contrition.  While the above factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

Each Capitol Riot case presents a unique mix of aggravating and mitigating factors.  It follows that the absence of certain aggravating factors in this case that are present in other Capitol Riot cases is not necessarily mitigating.  Further, the absence of violent or destructive acts on the part of a misdemeanor defendant is not a mitigating factor—had Christy Clark personally engaged in violence or destruction, she would be facing additional charges and/or penalties associated with that conduct.

The defendants entered the Capitol building shoulder to shoulder with hundreds of other rioters.  As is visible in the images that they recorded, they progressed past thousands of people to reach the upper terrace on the East side of the Capitol, and eventually make it through the East

Rotunda Doors, which had been violently breached multiple times. The defendants excitedly, deliberately crossed the threshold of the Capitol building amidst blaring alarms.

Christy Clark entered the Capitol building deliberately, enthusiastically, and with a full understanding of what was happening. She messaged a friend before she even reached Capitol grounds that the Capitol had been breached. Her use of the "breached" indicates that she understood that rioters were unlawfully entering the Capitol. Rather than heed the red flags and go back to the car, Christy Clark and her co-defendants went to the Capitol "prep[ared] for war." Her statements undercut any claim that it wasn't until she entered the building that she knew something was wrong and that she should leave. She knew it was wrong long before she entered the building, but she went in spite of that.

While inside, the defendants stood by and watched while police cleared the Rotunda. They had a full view of the officers' effort and appeared to be talking about it (*see, e.g.*, Figure 8, showing Matthew Clark pointing at officers clearing the Rotunda while Christy Clark and Spigelmyer standing next to him). The defendants knew they were not supposed to be there, and yet they passively observed while police were obviously trying to get them and other rioters in the Rotunda to leave. The defendants' disregard of the officers and clear signs that they should leave is aggravating.

As is the defendants' use of social media. Christy Clark advertised the riot on her Facebook page by publicly posting a number of photos from the riot, which she later deleted. She told a friend that she would have posted other photos, but she was waiting to "see if I'm already in trouble. Lol." Numerous people viewed Christy Clark's posts, some of whom reported the activity to the FBI. Her more egregious statements in private messages demonstrate that Christy Clark felt no remorse or regret at having participated in the riot. If anything, she was proud.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence imposing home detention, a meaningful restriction on the defendants' liberty, in this matter.

### B.  Christy Clark's History and Characteristics

Christy Clark has previously been employed as a maintenance worker, but she is unemployed as of October 2021.  She is married to co-defendant Matthew Clark.  Christy Clark has three adult children from a prior marriage.  As set forth in the PSR, Christy Clark has no criminal history.  (PSR ¶¶ 32-36.)  As noted in the PSR, Christy Clark failed to report to pretrial services as required the weeks of April 10, 2021, and December 18, 2021, (PSR ¶7) but has otherwise been compliant with the conditions of her release prior to sentencing.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.  "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[2]  This factor weighs in favor of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

---

[2]     Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant.  18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.  As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [[Defendant Last Name]] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation."  *Id.* at 70.

19

The gravity of these offenses demands deterrence.  This was not a protest.  *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).  And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences.  There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Christy Clark's post-arrest interview, statements in social media, and the absence of any expression of remorse to the PSR writer clearly demonstrate the need for specific deterrence for this defendant.  Christy Clark has, at best, minimized her conduct and, at worst, expressed pride in her crimes.  In her post-arrest interview, she exhibited no recognition of the seriousness of what happened at the Capitol on January 6.  It does not appear that Christy Clark has yet to come to terms with the gravity of the riot or of her own role in it.  The government acknowledges that Christy Clark has accepted responsibility by entering a guilty plea.  But her failure thus far to meaningfully acknowledge the wrongfulness of her conduct demands specific deterrence.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3]  This Court must sentence Christy Clark based on her own conduct and relevant characteristics, but

---

[3]     Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

should give substantial weight to the context of her unlawful conduct: her participation in the January 6 riot.  Although those like Christy Clark convicted of misdemeanors are generally less culpable than defendants convicted of felonies, misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes.  A probationary sentence should not be the default.[4]  *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth at sentencing); *accord United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 (statement of Judge Friedman).

Christy Clark has pleaded guilty to Count 4 of the Information, charging him with parading, picketing, or demonstrating in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).  This offense is a Class B misdemeanor.  18 U.S.C. § 3559.  Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9.  The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and

---

[4]     Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

sentences.  Avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly."  *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009); *see also id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").  Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity.  *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007).  The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against police officers, and large number of victims.  Thus, even though many of defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons

to the relevant sentencing considerations in this case.  The government has often recommended, and judges have imposed, periods of incarceration in cases where a defendant's conduct has included one or more of the various aggravating factors present here.  For instance, judges have imposed probation with significant home detention in other Section 5104(e)(2)(G) cases where the defendant blatantly ignored police presence and/or attempts to remove rioters.  *See, e.g.*, *United States v. Robert Chapman*, 1:21-CR-00676 (imposing 3 months' home detention and 18 months' probation where, among other things, defendant took photos while officers were trying to clear the Rotunda); *United States v. Leonard Gruppo*, 1:21-CR-00391 (imposing 3 months' home detention and 24 months' probation where defendant scaled a small wall on the Capitol grounds, spent six minutes inside the Capitol Building, and disregarded officer commands); *United States v. Jordan Stotts*, 1:21-CR-00272 (imposing 2 months' home detention and 24 months' probation where, among other things, defendant screamed at officers as they cleared the Rotunda); *United States v. Terry Brown*, 1:21-CR-00041 (imposing 30 days' home detention and 36 months' probation where, among other things, defendant was arrested after refusing to leave pursuant to law enforcement orders).

Judges have also imposed home detention in other Section 5104(e)(2)(G) cases where the defendant witnessed and/or recorded breaches or violence against police officer.  *See, e.g., United States v. Andrew Bennett*, 1:21-CR-00227 (imposing 3 months' home detention and 24 months' probation where, among other things, defendant videotaped the violence on the way in and inside the Capitol Building); *United States v. Samuel Fox*, 1:21-CR-00435 (imposing 36 months' probation and 2 months' home detention where defendant, among other things, took photos of rioters vandalizing and breaching the Capitol, and defendant had expressed no remorse for her actions at the Capitol for almost a year); *United States v. Richard Watrous*, 1:21-CR-00627

(imposed 14 days' intermittent confinement, 2 months' home confinement, and 30 months' probation where defendant, among other things, took a photo of a damaged window by the Upper House Door but then still entered the Capitol Building and stayed for five minutes, and watched as a man went stole wine reportedly from Speaker of the House Nancy Pelosi's office, and defendant reentered the Capitol Building again later despite seeing those things that should have given him misgivings).

In other Section 5104 Capitol Riot cases, judges have emphasized the importance of defendants' remorse or lack thereof and considered the latter aggravating. *See, e.g., United States v. Jack Griffith*, 1:21-CR-00204 (imposed 3 months' home detention and 36 months' probation where defendant, among other things, displayed a lack of remorse after the Capitol Riot); *United States v. Vic Williams*, 1:21-CR-00388 (imposed 2 months' home detention and 12 months' probation where the defendant, among other things, had shown little remorse for his conduct); and *United States v. Brittiany Dillon*, 1:21-CR-00360 (imposing 2 months' home detention and 36 months' probation where, among other things, defendant barely got into the Capitol Building before being pushed out by law enforcement and expressed little remorse).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence

differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## V.     Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors.  Balancing these factors, the government recommends that this Court sentence Defendant Christy Clark to four months' home detention as part of a 36-month term of probation, 60 hours of community service, and $500 in restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on her liberty as a consequence of her behavior, while recognizing her acceptance of responsibility for her crime.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

By:     /s/
Kathryn E. Fifield
Trial Attorney
U.S. Department of Justice, Crim. Div.
Detailed to the D.C. U.S. Attorney's Office
601 D St. NW
Washington, D.C. 20530
Kathryn.fifield@usdoj.gov
(202) 320-0048